**A.J. WOOD, Jr., A. Jerry Wood III, Renda Horne, d/b/a Ogletree Cattle Co., and Larry Rariden and Aubrey Rariden, Individually and d/b/a Rariden Cattle Co., Appellants,**

**v.**

**H.M. GABLE and Bill Gable, d/b/a B & H Feeders, Appellees.**

**No. 2–82–087–CV.**

Court of Appeals of Texas, Fort Worth.

July 28, 1983.

**624**

Wayne P. Sturdivant, Amarillo, for appellants.

Bill LaFont, Plainview, for appellees.

Before HUGHES, JORDAN and BURDOCK, JJ.

## OPINION

HUGHES, Justice.

A.J. Wood, Jr., A. Jerry Wood III, Renda Horne, d/b/a Ogletree Cattle Co., and Larry Rariden and Aubrey Rariden, individually and d/b/a Rariden Cattle Co., have appealed the take nothing judgment rendered in favor of H.M. Gable and Bill Gable.

The appellants' suit for damages is based on the theories of bailment, negligence, breach of implied warranty, strict liability in tort and violation of the Texas Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Com.Code Ann. sec. 17.41 (Vernon 1982), *et seq.* The care, feeding and services provided to appellants' cattle while on appellees' commercial feedlot give rise to appellants' complaints.

We affirm.

The jury found that appellants delivered 8,971 cattle to appellees' feedlot between April 26 and December 14, 1979, for the purpose of feeding and caring for such cattle. Appellees accepted such cattle. The jury answered "no" to the question as to whether appellees redelivered to or compensated appellants for only 8,351 of the cattle appellants delivered to appellees. As to whether appellees represented their goods or services to be of a particular quality, standard or grade when, in fact, they were of a lower standard, quality or grade, the jury answered "no".

The jury did find that appellees were negligent in three respects in connection with the appellants' cattle: they failed to reject any cattle delivered to them which might have been in poor health or poor condition; they failed to timely advise appellants of the extent of death loss and to document death losses when they were occurring.

The jury found no negligence in appellees for failure to: properly process cattle on delivery; timely obtain medical care for sick animals; properly segregate sick animals; stop shipments from appellants when appellees couldn't care for cattle; notify appellants that unhealthy cattle were being received; and timely advise appellants the extent of health problems.

The jury found that appellees' failure to reject cattle delivered to them which might have been in poor health or poor condition was a proximate cause of any loss sustained by appellants. The jury found no proximate cause to appellees' failure to advise appellants of the extent of death loss or document the same when they were occurring.

Damages found by the jury for its only finding of proximate cause against appellees (that being negligence in "failure to reject"), were listed at $15,037.33 for A.J. Wood, Jr.; $611.55 for Ogletree Cattle Co.; $1,621.74 for A. Jerry Wood, III; and $5,379.38 for Rariden Cattle Company.

A.J. Wood, Jr., was found by the jury to have acted as agent for the other appellants at all times in question herein. Also, appellants' cattle were found subject to the control, direction and management of A.J. Wood, Jr., while at the B & H Feeders.

The jury was asked whether or not A.J. Wood, Jr., was negligent in some 27 respects. The jury answered in the affirmative on fifteen items, ten of which were also found to be proximate causes of losses sustained by appellants.

The ten include:

Shipping cattle with "shipping fever complex";

Shipping cattle with excessive "shrink";

Mixing cattle from different locations in same pen;

Failing to request incoming sick cattle be segregated;

Keeping pens "open";

Failing to direct closing of pens within one week;

Shipping southeastern cattle during cold, wet weather;

Failing to stop shipping sick cattle when requested;

Failing to timely sell cattle;

Failing to object to cattle's performance.

The jury found that the negligence of A.J. Wood, Jr., caused 85% of appellants' damages and negligence of H.M. and Bill Gable caused 15%.

The jury also found that large numbers of appellants' cattle were in a sickened or defective condition at the timne they arrived at B & H Feeders and that such condition was a producing cause of appellants' cattle deaths.

The jury found that the 632 head of cattle which were not redelivered died and that they did not die of causes independent of and not produced by the feeding, care and handling of such cattle by the appellees.

The jury found that appellants did not waive their right to claim damages in this case, nor were they estopped by their words, acts or conduct from claiming damages.

The jury found that the procedures utilized by B & H Feeders in the care, feeding and medicating of the cattle in question were in conformity with the "state of the art" as practiced by other cattle feeders in the Panhandle area of Texas at such time.

The jury found the 632 head of cattle which died were not unfit at the time of their delivery.

The jury also found that A.J. Wood, Jr., negligently failed to warn appellees of the sickened condition of the cattle shipped to them but that such failure was not a proximate cause of the appellants' damages.

Testimony in the case reflects that appellants commenced placing cattle in appellees' feedlot for the purpose of feeding, medicating and doctoring them to cause the cattle to gain weight. Appellants placed 8,971 head of cattle with appellees in the period from April 26, 1979 to December 14, 1979.

Appellees' records reflect that 620 of the cattle were not returned to appellants. Appellees testified that the 620 died. Bill Gable testified that he did not know why they died nor could he testify as to how any particular animal died. He could not testify as to which of the cattle that died were sick or stale cattle. He had testified that when sick or stale cattle were accepted, they generally died within 30 days of delivery to the feedlot.

Bill Gable also testified that some bulls that were delivered to appellants in Lots 954 and 956, had nothing wrong with them, as far as he knew. These were all castrated by appellees' employees and received tetanus vaccination. Fifty-three of those bulls died, some from tetanus.

Appellants group their first six points of error in their brief for discussion because they figure in appellants' theory of a bailment relationship between appellants and appellees. Appellants claim that the proof of delivery to appellees (bailees) and failure to redeliver the 620 head gave rise to a presumption of negligence which was not rebutted by appellees. Appellees argue that there was not a bailment in their arrangement with appellants, but an agistment.

Appellees cite the case of *Barclay v. Burge*, 245 S.W.2d 1021 (Tex.Civ.App.—Beaumont 1952, no writ) for their argument that "bailor-bailee" did not apply in the present case. In *Barclay* there is a discussion of "agistment" which defines it as a bailor-bailee arrangement, but a particular kind: "technically termed an agistment." In an agistment the burden of proof is on the agister to show that his failure (as here) to return the cattle was not caused by any negligence on his part, the doctrine of *res ipsa loquitur* being applied in Texas in agistment cases.

**626**

In the *Barclay* case the jury did not buy the agister's explanation. In the instant case the jury *did* accept the agister's account and said so by their answers to the special issues submitted to them. Although the jury in the present case found appellees negligent in three respects, they also found appellants' agent, A.J. Wood, negligent in 15 respects (10 proximate causes) and found his negligence proximately caused 85% of the damages and 15% was proximately caused by the negligence of the appellant-agisters. Tex.Rev.Civ.Stat.Ann. art. 2212a, provides contributory negligence is no bar to recovery except where as here, negligence of party seeking damages is greater than that of the party against whom damages are sought.

From an examination of the voluminous statement of facts in this case, we have concluded there is evidence to support the jury's verdict and the judgment of the trial court.

The jury had before it the testimony of numerous witnesses, including three veterinarians, concerning the care, feeding and deaths of the cattle here involved.

Dr. Stephen Lewis testified that the dead cattle he examined at B & H died from shipping fever complex which is brought on by stress (weather changes, shipping, barometric pressure, truck exhaust gases, and lack of food and water in transit). He testified that shipping fever is contagious and transmitted by cattle sneezing on each other.

Dr. Lewis opined that the cattle were exposed to the shipping fever before coming to the feedyard and that the cattle bought by appellants were cheap and normally gave trouble at feedyards. The same is true of cattle brought from Tennessee, Mississippi and Florida, which were also types bought by appellants.

Dr. Lewis also testified that he never found any of the deaths posted to be related to feedyard mismanagement, but he did say that many of the pens with death losses were add-on pens where appellants caused cattle to be added over a four to six week period.

Dr. Lewis testified that if appellants wanted to cut death loss they should have pre-conditioned their cattle before putting them in a feedlot. He attributed the drop in death loss after his program was instituted to there being no new cattle added to the pens.

Dr. Gary Cash testified to the period in 1979 before Dr. Lewis took over. He testified to having seen appellants' cattle arriving and unloaded. His description of them was cattle of extremely poor quality in a highly stressed condition with a high level of sickness. He posted some every time he visited the feedlot. He said shipping fever was indicated from the lung lesions he observed in the dead cattle. He testified that it was his opinion they had shipping fever when they got off the truck upon arrival at the feedlot.

According to Dr. Cash the number of sick cattle arriving in December increased significantly. They were too sick to process and were given shots of Terramycin and neomycin. The cause of death of all the cattle he posted was either shipping fever or pneumonia.

Dr. Cash asserted that the Fall of 1979 was miserable weatherwise (cold and wet). Such weather caused the kind of problems suffered by the cattle in the B & H lot. He also stated that add-on pens were a poor practice as they caused healthy cattle to become sick from association with unhealthy cattle. Appellants kept their add-on pens open up to six weeks and added new cattle from time to time. This was testified to as being a bad practice.

Contrary to Woods' assertion that he did not buy any trader cattle (prone to be stale), there was testimony that Woods' agent, Rip Collier, bought trader cattle for him. This was supported by seller consignment sheets showing purchase by Woods of cattle from traders at the Wichita Falls auction.

Collier testified that trader cattle had to be bought at discount because of higher death loss than fresh cattle and that the

degree of stress determines the death loss rate.

Dr. Lewis testified that a tetanus serum that does not work does not hurt the animal and that since the steers had no abscesses, the serum was not contaminated (as urged by Woods).

In view of the jury findings and the facts adduced in this case, we hold that appellees proved enough to rebut any presumption of negligence in their care of appellants' cattle. *First National Bank of Mission v. Thomas,* 402 S.W.2d 890 (Tex.1965).

We overrule points of error one through six.

Because of the testimony of the veterinarian, Dr. Lewis previously recited that the tetanus serum did not contaminate the bulls that died, we overrule point of error seven.

Because no special issue was requested or tendered by appellees asking whether the claims of appellant were groundless and made in bad faith under Tex.Bus. & Com. Code Ann. sec. 17.51 (Vernon 1982), we overrule appellees' cross-point one.

We also overrule all other cross-points of appellees, as we have affirmed the case and such cross-points were conditioned on our reversing the same.

We affirm.